Thank you, Your Honor. May it please the Court, my name is Alan Copsey, Deputy Solicitor General with the State of Washington, here representing the State Defendants. In Stormont's 1, this Court held that these rules are neutral and generally applicable, and therefore subject to rational basis review. The rules have not changed since Stormont's 1. There was no change in their operation or application. There was no new pattern of enforcement. The rules are still neutral and generally applicable, and this Court should reverse the district court. When you say there's no new pattern of enforcement, at the time of the prior hearing, there had been an injunction in place with regard to all parties, so there couldn't have been any enforcement, could there? That's correct. Does that mean there's been no enforcement since then as to anybody else? That's correct. There's been no enforcement of these rules against any party. Even though the injunction applies only to the plaintiffs? That's correct. That's correct. These rules, you know, here's what the evidence shows at this point. In 47 years of existence, the stocking rule has never been enforced against any pharmacy or pharmacist because of a religious objection. In 7 years of existence, the delivery rule has never been enforced against any pharmacy or pharmacist on the basis of a religious objection. In 2006, there were 24 complaints filed against Stormins, and every one of those were closed except for three that were left open when the district court ordered that no further processing should occur. That was a prime opportunity, if the board was interested in targeting a religious objection or targeting this particular religious objection, to take disciplinary action and instead Well, in 2006, was the regulation in place? No, it wasn't. So how could they have taken disciplinary action if the regulation wasn't there? Well, that's exactly the point. The stocking regulation was in place, and the alleged violations, some of them were alleged violations of the stocking rule. And even though there was an opportunity to target Stormins, the board didn't take it. The board has never taken a disciplinary action against any pharmacist or pharmacy on the basis of religion or religious objection. Counsel, I have a question about how the stocking rule is interpreted by the state, because one of the things that has changed is that Plan B and the generics that are the same chemical are now available over the counter. And Ella is still a prescription item, as I understand it, even though it looks like you can get it over the Internet pretty easily, it is still a prescription item. So what I'm curious about is how the stocking rule applies to different chemical compounds used for the same purpose. So let me give you an example. Suppose that Aleve is prescription only, but that Advil and Tylenol are over the counter. Under the state's interpretation of the stocking rule, would a licensed pharmacy have to carry Aleve, in my example, or would it be sufficient that other drugs with different compounds but for the same purpose are available? The stocking rule does not require that any pharmacy carry any specific drug with the exception of Ipecac, which is required for every pharmacy. Well, so can you specifically answer my question, in my example, would a pharmacy be in violation of the stocking rule if it declined for any reason to carry Aleve, in my example? Well, the way the stocking rule works is that- It's a yes or no, and then you can explain. Well, it's not necessarily, it's not a yes or no answer, I'm sorry to say, because it depends on what the patients need, what the patients for that particular pharmacy require. The stocking rule is tied to the patient population. It doesn't require specific drugs be carried by any pharmacy. So if a pharmacy's patient population needed the particular drugs you're asking, then the pharmacy has a duty under the stocking rule to provide those. The reason I'm asking is that if the availability of Plan B over-the-counter completely erases the requirement that a pharmacy carry Ella or some other form of morning-after medication, then I would be asking myself whether the case is moot, if it doesn't even apply to require the thing that plaintiffs don't want to require. Well, two responses. One, Plan B is available over-the-counter only to patients who are 18 and above, not to patients who are younger than that. So it's still a prescription medicine for younger patients. Secondly- Really? I thought the whole point of Judge Corman's order was to go farther than that. I beg your pardon? I thought the point of Judge Corman's order, the Eastern District of New York case, went further than that. Well, we were asked to brief that order, it seems to me like it was about a year ago. Yeah, time flies when you're having fun. And the question at that time was whether that order, whether the order of the FDA at that time made the case moot. And we explained in our briefing that it doesn't make it moot, both because Ella is still a prescription drug and because- Well, I know that's your argument, but that's why I'm questioning you because I don't- it isn't obvious from either the stocking rule or the delivery rule that a particular result would follow, at least to me. There's one additional answer which I think is very important, and that's to remind the Court that this rule, from the Board's perspective, has never been about Plan B specifically. It's been about access to time-sensitive medications. Right, but the specific application that the plaintiffs are challenging is it's an as-applied challenge to that. I have another question for you on a different topic, and that has to do with the 2010 stipulation that talked about facilitated referrals and that those can also help assure timely access to prescribed medication and that facilitated referrals don't threaten timely access. What is the State's view of the effect of the 2010 stipulation on the issues that we have to decide? Well, the district court said that the stipulation was not dispositive of any issue, and we would agree with that. But the stipulation- what the State stipulated to is true in the abstract. In other words, a facilitated referral is more effective than a denial of access to the drug. In that sense, it's an effective way of providing a medicine to a patient. But the delivery of a time-sensitive medication that is in stock, on site, is always more effective at getting a drug to a patient than any referral. I have a question. Isn't the good faith exception very similar here in this case, very similar to the good cause exception in Schubert? I don't believe so, but it's important to recognize that the mere existence of a good faith exception or an individualized exception isn't the test. The test is whether that exception has been applied in a discriminatory fashion. And there's no evidence in this record that the good faith exception has ever been applied discriminatorily. Well, wasn't it highlighted in either Schubert or Smith that it's the fact that the board or the entity is exercising discretion? Does that not play a role here in terms of evaluating it for whether it's generally applicable? It doesn't play a determinative role. In Lukumi, the court made it clear that the mere existence is not enough. The fact that there's discretion is not enough. As I mentioned earlier, neither of these rules, including the good faith language, has ever been enforced discriminatorily against any pharmacist on the basis of religion or religious objection. Has it ever been enforced? No. No. I mean, the stocking rule has been enforced, but never against anybody on the basis of religion. But you're taking the position it could be. I mean, otherwise, why are we here? You're saying someone, these plaintiffs, could object, make clear the basis of their objection, and the whole reason we're here, as I understand it, is that the state wants to maintain the possibility of enforcing the rule in that situation. But not because it's targeting religion as a particular reason, but because it doesn't provide access to patients. It's not a patient-centered exemption the way that the others are that are in the rule. Well, part of what's frustrating for me is that I look at this, and you start by emphasizing the fact that there hasn't been enforcement. We don't have a flood of complaints. There's not much, if any, evidence of actual denial of access. The last time around, there's a lot of concern about what happens in a rural community where this may be the only pharmacy for some distance. But this injunction pertains only to these plaintiffs, this pharmacy in Olympia. Nobody pretends it's the only pharmacy available. I can't help the feeling that this is somewhat, I don't know, contrived. There's not really a problem here, and yet both sides have really gone to battle with big armies over exactly what. What is at stake here? Well, what's at stake is not the language of the permanent injunction, but the rationale that was applied by the district court to assess the free exercise case. The district court did not follow the directions of this court in determining whether or not the rules were neutral and generally applicable. Counsel, if we were to determine that either the case is moot or there is no real controversy, we would presumably vacate everything that the district court did, and why wouldn't that be just as good from your point of view? Well, that would be an adequate remedy, Your Honor. This court doesn't have to. I mean, what this court's precedent says and what Supreme Court precedent says is that this court doesn't just defer to the findings of the trial court in this kind of a case. The court does an independent review of the findings to decide whether or not they're supported by the evidence. Well, let's talk about that a little bit. Is it the Berger case that you're citing for that authority in terms of what the district court sort of review gets in this situation? It's Berger, Ashelman, and Rosenbaum. And in addition, the Tenafly case that the plaintiffs rely on from the Third Circuit says the same thing. Well, in the Berger case, you're relying on the one set. It was a free speech case, and the authority it cited was other free speech cases. Right. But then classified it as a First Amendment sort of rule. But there's no other cases that I can see, particularly free exercise. I mean, all of them have been free speech cases. I know there's an argument that Berger implicitly overrules some of these cases that call for clear error review. But I'm curious, though, how we can say that it implicitly does so in light of the posture. Well, the language of the cases is it's a free speech case, but the language of the decision is not limited to free speech cases. Well, it's just one reference of First Amendment cases, and there's no other cases other than free speech cases. So let's just assume it's clear error. What do you say in response to that? And let's just assume it's clear error. I know in this case there's been a question raised as to the level of review, especially in light of the fact that the district court's findings of fact and conclusions of law adopted almost wholesale adoption of the plaintiff's version. And then there's a case that calls for a special scrutiny of the district court in that circumstance. What does that mean? Well, if the court were to apply clear error, it could find clear error. And I'm happy to give you a number of examples of where that error would lie. Okay. For example, the district court found a series of unwritten exemptions that it said were the rules were riddled with unwritten exemptions that would allow refusals in situations not involving religion. Let me give you some examples of one of those. It found an unwritten exemption allowing pharmacies to decline to carry drugs like Sudafed that are used in manufacturing amphetamine. The only basis, the only citation for that fact is the testimony of a Department of Health employee who's not on the board of pharmacy and who acknowledged that the board would have to make the determination. What about the e-mails of Mr. Sachse? I beg your pardon? The e-mails of Mr. Sachse. Mr. Sachse. Yes. The e-mails, I mean, some of them were seem to support the district court's discriminatory intent finding. What does that change? Most of his e-mails were talking about concerns that were raised during the rulemaking process. You know, so during the rulemaking process, the board received something like 25,000 comments and they were on both sides of the issue. There were pharmacists who were concerned that the rules would require them to dispense or to deliver drugs that they had not been required to deliver in the past. He was conveying those concerns. He wasn't saying this is what the rule would do or wouldn't do. He wasn't saying this is an exception. He's saying this is the practice before the rule. Were those e-mails, were they evidence in the preliminary injunction trial? You know, I don't recall if they were or were not. I don't believe they were, but I wouldn't swear to it. I have another question. Let me ask you, let's assume strict scrutiny applies here. I know you're arguing for rational basis review, but let's just assume strict scrutiny applies. Do the regulations pass strict scrutiny in your view? Yes, they do, both because there's a compelling government interest protecting public health, and this Court has held in more than one context that that is a compelling government interest. What about the least restrictive means, especially in light of the Hobby Lobby case? Well, the least restrictive means that the plaintiffs are arguing for is referral, and referral is just not the panacea that the plaintiffs are arguing that it is for several reasons. One is there's substantial evidence in the record that not every patient can succeed with a referral, either because they don't, they lack transportation, they lack the financial resources to move from one pharmacy to another. Well, it also is related to the issue that plaintiffs raise on the other side, which is they say suppose there's only one pharmacist and one pharmacy for miles and miles around, therefore they say this has an impact on us, but you're saying therefore it also has an impact on the patient who can't be referred without going 200 miles somewhere. The Board tried to reach a compromise in that respect. It said that the pharmacist as an individual is not obligated to dispense any drug to which they have a personal objection, but it placed the burden on the pharmacy as a business to make sure that its patients obtain the medicine that they need. That may have been well intended, but if we're talking about a rural, isolated location, are you going to have a pharmacy that always has two pharmacists on duty at all times? Probably not. So it really doesn't answer the problem, does it? Well, if you assume that that's the only way that a pharmacy could provide the drug, it doesn't, but that's not the only way a pharmacy could provide the drug. In the previous go-around in this case, there was evidence about telepharmacies, and the Board, even though it's not in the record, the Board has been developing additional rules governing telepharmacy as an option to address that. So the pharmacist himself or herself wouldn't have to dispense somebody else would authorize by phone? Why can't that work for a pharmacy? Why couldn't that device be used for a facilitated referral? So if they come into Storman's store, into Ralph's, they call over to the CVS store down the road because Olympia's got other pharmacies around, and, yep, we've got it here. You can come pick it up. The problem, what you're talking about, is a referral to another pharmacy to get the drug. The situation that telepharmacy would allow or some other solutions would allow is for somebody who comes into Storman's to get the drug at Storman's, even though the pharmacist objects to it. That doesn't solve the objection that Storman's has because Storman's does not want to stock the drug at all. They would not want to provide it no matter who is prescribing it or dispensing it. Storman's is the only example that we have in this case of a pharmacy that has publicly announced that it will not provide a drug that its patients need. Has any other pharmacy indicated it intends to take that position?  So this whole thing is all about one pharmacy in Olympia where there must be another dozen pharmacies nearby? And the board decides that facilitated referral won't work for that one pharmacy? And you're telling me this case isn't contrived? No, Your Honor, the rules are adopted to deal with the general situation. The rules were in process for quite a while before Storman's announced it. The possibility of conscientious objectors were plainly known, and the survey taken indicated that's a tiny little fragment of the population. Now, before there was a lot of talk about maybe that tiny little fragment is someplace where there is no other realistic access. But if it turns out the only pharmacy that poses a problem is in Olympia, I have a hard time understanding why some accommodation can't be made. It's fine, and I don't disagree with the notion of making accommodations so that economic disadvantage doesn't come to a pharmacy, requiring it to stock things that nobody or few people want to buy. But now we're in the posture of saying it's okay not to stock something to save a buck, but it's not okay not to stock something because you have sincere religious beliefs against it, even though there appears to be no serious access problem posed by honoring that objection. Under rational basis review, even if the board is mistaken about the access issue, that's not the kind of fact-finding that's subject to judicial review. That's a legislative fact-finding. And so the fact that the board is trying to take legislative action to deal with the generic problem statewide before it becomes a major problem of access is not a reason to invalidate the rule. I'd like to yield time to co-counsel, if I may. You may do so. May it please the Court. My name is Tom Bader, and I'm one of the attorneys for the interveners in this case. And these are seven individuals who have a belief in the importance of reliable access to prescription drugs. I'd like to turn to one of the topics that has been discussed here, which is, is there a problem? There is a very serious problem, and the problem goes well beyond one pharmacy in Olympia. We go back to 2006 and 2007, where there were hearings where 21,000 written comments came in, and there was testimony, and the problem was widespread. And although Plan B and emergency contraceptions Let me be specific here, problem. The fact that you're getting 21,000 people to comment on one side or the other doesn't really tell us or establish there's a serious problem as to access. What evidence is there as to the actual access problem? Well, I would suggest that if you go to ER 893 to 910 in the record, you will see the video clips and transcripts of the testimony of real, live problems that were being encountered with refusals to deliver emergency medicine. And it's not just Plan B and emergency contraception, as important as that is, but it was HIV-AIDS medicine, in other words, concern that there is a discriminatory attitude by some in the pharmacy area as to filling those prescriptions. And failure to fill an HIV-AIDS prescription is serious to the extent that it could be life-threatening, particularly if it's not done in a timely fashion. The whole group of medication What's the time period we're talking about? We are talking about these video clips of testimony. No, I mean timely. I mean, morning after pill, you understand there's a clock that's ticking. The HIV medication, what's the timeliness concern for getting access to the medication? If you were to not have it on the days in which they are, you know, you're supposed to be taking them on a regular basis, the whole group of medication that has been prescribed for AIDS can cease to work. And then if there may not be, I think medication Well, what that tells us is that the rule, the delivery rule, is general, is generally applicable, which was the holding of this court the first time around. But it doesn't really answer the as-applied challenge. Assuming that the rule is otherwise valid because it applies to many situations, whether it's blood thinners or HIV patients or whatever it may be, there's still a question of how the delivery rule should be applied in the face of a religious objection. And that's why it's so important, I think, that this court not find this moot. It's that principle which is at stake in this case. In other words, is Smith, Licumi, and the 2009 decision by this circuit in this very case, is that the way in which a free exercise challenge is to be measured? And regardless of whether the particular injunction in this instance is only against the plaintiffs in this case, that ruling is just tremendously important. And the fact of the matter is that one needs to start with what is the law that applies, and I believe that it's clear in this circuit what it is, and it was as articulated in the Stormont's case, the 2009 decision. And one of the problems with the way in which the trial was conducted is that the mandate was to basically take a rational basis approach to the case, and that was the review that was supposed to take place, but it did not take place. And under rational basis review, as articulated by the Ninth Circuit in the first Stormont's case, the burden was to be on the plaintiffs to negative every conceivable basis which might support the rules. And one, there is evidence in the record at the point, for example, that I specified, but a legislature or an agency does not have to have specific instances for there to be good reason or a rational basis for implementing a rule. You know, that is the substantial discretion of the legislative or the rulemaking body. You point to Stormont's one. Does the evidence that was presented during the trial matter? Well, I think that there is, in our view, most of what was submitted or occurred during that trial is not really relevant to the issue of application of rational basis standard to the review for the case. But in theory it could have been. That's why it was admitted, right? Well, there was a fairly narrow basis for a trial. As a matter of fact, we moved for summary judgment because we felt it was a summary judgment, because under the standard that arises from Smith-Lakoumi and ultimately from the first 2009 Stormont's decision, there was only one issue to be decided, which was the burden should have been on the plaintiffs to negative every conceivable basis which might support the rules. Counsel, you're down to about three and a half minutes. Did your side wish to save any rebuttal? No. The rebuttal is going to be handled by. Right, but he can't handle it if you use up all his time. That's why I'm asking. Oh, I do not want to use up all his time. Thank you for letting me know. Thank you. And thank you for your time. May it please the Court. My name is Kristen Wagner, and I represent plaintiffs' appellees. At the core of this case is plaintiffs' practice of facilitated referral. It is undisputed that this practice was approved by the State of Washington for many years. It is still approved by the American Pharmacists Association and 34 other national and state pharmacy associations, and it remains legal in virtually every other state. In fact, the record and. . . doesn't necessarily mean that Washington can't have more stringent rules, does it? Washington can have more stringent rules, but not only does this regulation violate the standard of care as other pharmacy associations have talked about, but the exemptions that are in it, they are applying the regulations only against religious objectors and not against a host of other business, economic. . . It sounds to me from, or it looks to me from what I've read so far that they're not applying it at all, which is actually one of the more difficult parts of the case for me, is that it doesn't seem to be applied. So I'm not really sure how you can say they apply it only against you when they don't apply it against you at all. Well, they have applied it against our clients. In what way? We are the first pharmacy in the 50-year, nearly 50-year history of the stalking rule to ever be faced with an investigation, and the state's counsel. . . All of the investigations that are done are complaint-based, and this one was as well. So in that sense, the complaints may all be different, and this may be the first complaint of its kind, but I don't understand how that helps you. Well, first of all, the argument that the rules have to actually be enforced against our client in order to render them not neutral or generally applicable would only go towards the selective enforcement argument, not the other arguments. It goes towards whether there's a live controversy. There certainly is a live controversy in the sense that the investigations have been pending against our clients for the last seven years. Are you saying that investigation is enough, that there doesn't have to be some sort of decision based on the, or a result based on the investigation? Well, Lukumi itself was a pre-enforcement challenge, and we can see Fraternal Order of Police as well didn't have a decision on that. But more important, the trial court record contains overwhelming evidence of the state's witnesses and the state's own trial attorney saying that we are in outright defiance of the stalking rule and the delivery rule, and the chair walked through the guidelines and said the only remedy that the board has is to, in fact, remove the license and revoke it. What specifically, in your view, is wrong with the rules? That is, is there something wrong with the stalking rule, which was in existence long before the drugs to which your client objects even existed? Or is it the delivery rule? What is it exactly that is the problem in your view? There are several different problems in our view. The delivery rule, essentially, the state, through the delivery rule, has given a new interpretation to the stalking rule. So both the delivery rule and the stalking rule contain categorical and individualized exceptions that render them not neutral or generally applicable. Except, counsel, in the 2009 case, this Court has already held that these rules are neutral and generally applicable. Your Honor, and so that is our starting point as a panel. So I'm not sure. We're kind of going round and round, but I'm not sure what remains for us to do in response to your specific argument. Well, the general rule in the Ninth Circuit is that preliminary injunctions do not constitute law of the case, and there's a narrow exception for questions of law. It doesn't matter. Well, I have two thoughts about that. First of all, whether it's law of the case or not seems less important than whether it is the law of the circuit, which it clearly is. So let's assume that the first case dealt with John Doe Pharmacy. It's still announced that these specific rules in Washington were general and neutral. And so why isn't that a subsidiary ruling of law to which we must be bound regardless of whatever additional arguments are made? Because whether a law is neutral or generally applicable is a highly factual, intensive inquiry. The trial court, or excuse me, the panel on this first statement's decision twice said that there would be a trial on the merits. There are new legal arguments that are before this Court that were never before the first panel. The argument and the claim that the rules have not been applied even handedly, the breadth of the regulations, there was nothing in the record about the breadth of the regulations. Mr. Sachs's emails were not in the record. We had no evidence that went to the accommodations and the fact that they are not available. We had very little. I don't understand that comment. I've understood from the record that any individual pharmacist may decline to dispense a drug to which they have a religious objection. Is that a correct understanding? Those accommodations... Is it a yes or no question? No, it is not a correct understanding. So if an individual pharmacist must dispense in spite of that, where in the record is that? Well, a perfect example is what happened to our client. Our client was constructively discharged when she said that if a patient came in for Plan B, she would not be able to fill it and would need to refer. Her employer told her that they could no longer keep her on staff because they needed to have a pharmacist available. They couldn't do a second pharmacist. They couldn't do an on-call pharmacist. The record and the court's findings are very clear on this matter, including the board's 30B6 witness, which testified specifically on the requirements for telepharmacy and the accommodations that the board considered when it was passing this rule. Let me move to something else that is of concern to me in this case, and that is the analysis that should flow from the fact that pharmacy is a licensed profession. And I want you to consider the following hypothetical. Let's suppose a person wanted to become a lawyer or form a law firm, and they had a religious belief that it is immoral to keep secrets, and they therefore would not keep the confidences of their clients. Would the state be required to give them a law license or to allow them to write a blog about what their clients had told them? Or would the state's interest trump, in the context of licensing a person to help others within the society, would that trump their conscientious view? The attorney, the answer is no. They would not be the license could be denied if they refused to keep the confidences. And why isn't this exactly the same thing, where the state has made the determination that perhaps in their view the most effective method for ensuring that individual patients in Washington receive all their prescribed medications as soon as possible, that this is a requirement to become a commercial pharmacy? Because the record very clearly demonstrates that is not what this rule is doing. And Lukumi tells us you look at the rule on the ground, the real effect in actual operation. That is what this court should look at when reviewing the regulation. What we can see is the undisputed fact that pharmacies are refusing or referring for all kinds of business, economic, and convenience reasons. In fact, several board witnesses testified, those who were charged with preparing and those who were charged with enforcing these regulations testified, nothing has changed in the practice of pharmacy, except religious objectors are no longer allowed to refer. That's it. Nothing more and nothing less. Again, we go back to the exemption analysis and looking at the relative legal inquiry under the categorical analysis is to look at what is the state's interest, what conduct are they permitting, and does that conduct undermine the state's interest in a similar way that religious objections would? We can take a few examples to demonstrate that. Well, the examples in the rule are quite different than the ones that you're talking about because the examples in the rule are things that are much more directly, obviously related to patient care. For example, that someone is taking another drug that might interact with it or something along those lines. So what is it that is similarly keeping people from getting their prescribed medicines timely? The district court made a finding in a chart that there are 27 different practices  And the opposing counsel has said that those are clearly erroneous findings. Well, he would be incorrect because if the court reviews the record, for example, The ice may be thin. The finding with regard to Catholic hospitals, for example, is based on what? The finding with regard to Catholic hospitals goes to one of six theories of the free exercise violation here. That would be differential treatment. Well, part of the problem I have with the findings, facts, and conclusions of law is that it looks like a Christmas tree or a wish list of all the possible concepts that might be added up. When I go to look at what's behind it, I don't find a whole lot for some of those. The entire record would demonstrate a whole lot. What we can do is look at the operation on the ground, which is what this court should do both in the individualized analysis and the categorical. What we see in terms of the operation on the ground is that in each one of those cases, for example, boutique pharmacies, niche pharmacies, almost all witnesses conceded those exist, the state permits them, and the state tolerates them. That's fine. And has there been a complaint as to any of them for inability to obtain this medication? We're not entirely certain whether there has been a complaint about them. But the board has. Did you introduce evidence that there was? That is the question. We introduced ample. That's a yes or no question. Did you introduce evidence that there was a problem in the situation that Judge Clifton has just noted? Yes, we did introduce evidence that there was a problem. Many witnesses testified that these niche pharmacies exist. That doesn't answer my question. Let's just ask a different question. Let's not. Just answer the question. Has there been a complaint filed against any of these niche pharmacies, or did you introduce any evidence about any complaint being filed about the niche? We did not introduce evidence about a complaint being filed. The state introduced supposedly 170 complaints that had been filed, but none of those really dealt with the stalking role that we could tell. But the important piece of this here is the board is not complaint-driven, and that was a factual finding that the district court made. They go in, unlike Rosenbaum cases and the Waite case, they go in every two years and inspect pharmacies. They have a checklist. They go through the 150 regulation. There are six components to it. They check every one of those on the list of six except the stalking role. And they've issued all kinds of newsletters and informational letters on different violations of the law, yet never once have they tried to stop these business inconvenience referrals. I'm not sure how this inspection with regard to the stalking role helps you. Do you want them to look to make sure that Plan B is available to each of these pharmacies? The testimony was even the board's chief inspector testified or excuse me, it wasn't the chief, it was the most senior inspector testified, that he could go, they go to the shelves to see whether there are drugs in stock. They look at the pharmacy records that they could easily check and see whether patients have been denied medications or referred, but they choose not to do so. It's never been important to the board until the issue of Plan B came up. Was Ralph's Pharmacy picked up because of one of these inspections and they looked at Ralph's in a way they didn't look at anybody else? No, Ralph's Pharmacy was picked up because test shoppers from Planned Parenthood and other pro-abortion groups came in and targeted them. And so the question becomes, have they been singled out? Have there been complaints against other pharmacies that the board elected not to pursue? The board has said that they know, for example, that the Catholic pharmacies are not stalking it. They know that pharmacies are hanging signs saying they will not stalk pain medications, yet they're not pursuing that. So the board is clearly on notice that all of these supposed skirting, as the state referred to, is going on, yet they've deliberately chosen not to pursue those violations. And the board testimony at trial was that's consistent with what the board wants to do. The board witnesses themselves testified that these rules give the wiggle room and the leeway necessary for the board not to enforce regulations in a strict way, but to instead allow these referrals to occur. We can see that in the individualized exemption analysis as well. The substantially similar circumstances language is an individualized exemption. The good faith compliance language gives the board plenty of leeway not to enforce these regulations. I have another question for you, which is somewhat in the nature of a theoretical question. In cases like Smith and the animal sacrifice case, the name of which I can't pronounce correctly, the religious practice that was involved at least arguably did not impinge on any third party's rights. That is, if the individual Native American used peyote, it didn't bother anybody else. Here there is a third party at stake. That is the patient. And the state has a legitimate interest, a very strong interest, in ensuring that prescribed medication gets to patients. How does that change our analysis? Because there may be religious reasons why the patients demand this medication, just as there are religious reasons why it is withheld. So how does that factor into our analysis? Well, I think Hobby Lobby touches on that, the Conestoga Hobby Lobby decision. That's a statutory case only. Are there any cases that involve the constitutional analysis that would talk about the third party's rights in this context? Well, we can look at a variety of cases that are free exercise cases, Ward, for example, and other cases where what the court's operative analysis is is to look first at what is the state permitting and does that undermine the state's interest without regard to the third party interests of parties. So the state's interest in that sense represents the third party. So the state's interest is much greater if it's protecting these third parties, is it not? Well, except there's not a shred of evidence in the record that it is protecting the third parties. You don't think that timely delivery of medication to patients that's been prescribed by their physicians is an important right for the state to protect? I think that if there was a problem with access to medication, this would be a very different case. You referred to ER 893 to 910 as evidence of difficulty with access. Are you telling us that doesn't support that proposition? I'm telling you it does not support that proposition. And the court made factual findings. First of all, those patients in the record were from the 2010 rulemaking process, long after these rules were passed. There was nothing more in the 2010 process in terms of the testimony as interveners taking an opportunity to try and come up and manufacture refusal stories, which is exactly what occurred. Second, if this court were to look at those statements, they would find very few that even resulted in refusals, and more often than not, none of them resulted for religious objections. Many were out of stock. This rule has not done anything to tighten up the stocking rule. The state still can't articulate what the stocking rule means to this court. And that, in and of itself, is an individualized exemption. It's giving the state the authority on an ad hoc basis, as in Axon Flynn, as in Alpha Delta, as in Ward. Well, tomorrow's newspapers are going to be filled with discussion of executive discretion. More about immigration, perhaps, than about this. But, in fact, the executive branch does have discretion in deciding when to prosecute and when not to. It's kind of a gray area in terms of what point it can be that they exercise discretion for Jones but not for Baker. Well, when religious issues are implicated, the courts and the precedent tells us that this court scrutinizes that discretion. But you're telling us one of those people that gets cut slack are Catholics. What I'm telling you is that the board has not chosen at this time to pursue Catholic pharmacies. The interveners have posited the reason for that is because they're too big to fail. Because you would create a health care crisis when you force religious objectors out of the practice of pharmacy, which, again, underscores the categorical analysis. The state has posited that its interest here is in access to medication, yet it allows a host of business and convenience reasons not to refer. Pharmacies can hang signs. Pharmacies can choose not to cater to certain clientele. They can decline to fill over-the-counter products because they don't want to hassle. Certain clientele. What are we talking about there? Who can they decide not to serve? There was testimony that they hung signs that they don't stock pain medications because they don't want to have those types of people in their store. The inspector and the executive director acknowledged they've seen these signs. And in addition, there are instances, many instances, where pharmacies don't stock cough syrups. They don't stock other forms of medications because they don't want to have certain clientele in their stores. In addition to that, though, there are many other exemptions that are in this rule, aside from just the dislike of clientele. We can have instances where pharmacies need to take 10 minutes to register to sell a drug to a schizophrenic patient, yet they don't do that. Simple compounds. Every pharmacist is trained to do simple compounds, yet the record overwhelmingly demonstrates pharmacies do not fill simple compound prescriptions. They refer. Even the chair of the board of pharmacy testified he refers for simple compounds. In addition, the unit dosing exception. Pharmacists will be presented with a prescription to do a unit dose, and most pharmacies choose not to do that. The board has never pursued any of those. Have they received any complaints about those? Does the record show that they have received complaints about those instances that you just described, yes or no? The record does not show that there have been formal complaints made. What it shows is that the state knows these practices occur, and they ignore them. Well, they're a complaint-driven process. Wasn't that evidence in the record? No. In fact, the trial court specifically found the opposite, that they're not complaint-driven, and they never have been. Okay. With respect to the trial record, he apparently adopted all but eight of your findings of fact and conclusions of law. And so there's a case that says we give special scrutiny to that. What does that mean? I believe that the case you're referring to references whether the court entered and mechanically adopted the findings. First of all, I would point out that there are several other cases that say when a trial court judge issues findings of fact that are nearly verbatim, you would ensure that there's not mechanical adoption. But this court issued a voluminous opinion in addition to the findings of fact, and the court has not expressed a desire to more closely scrutinize it when the court has issued a separate opinion that is consistent with the findings. That doesn't quite help. It's like the fruit of the poisonous tree. If there was something wrong with the way the findings were done, then an opinion that expounds upon erroneous findings doesn't become correct. So we still are left with the question whether the findings are clearly erroneous or whether they, even if we don't review them de novo, or are we supposed to review them de novo because they were nearly verbatim from the plaintiff's suggestions? I think that's the issue that Judge Murguia is striving at. There's no case law that would support this court reviewing de novo the court's findings of facts and conclusions of law or its opinion. Berger. Well, Berger deals with a different issue, Your Honor. I'm sorry. I thought you were focusing on the mechanical adoption analysis. I am, but it's still related. I mean, Berger, the reasons cited by the defendants were that it was First Amendment reference. It was free speech, as Your Honor has already noted. I know, but I'm asking you the same kind of questions I'm asking the other side, so respond. Sure. I'd be happy to. In terms of the standard of review, Berger, if anything, best case scenario, is an aberration from this court's case law. Berger tracks back to Rosenblum, Daily Herald, and Tucker, and Lovell, all of which state that the rule is there's special solicitude given on the standard of review when a free speech claimant has their speech restricted in the court below. That is not the case here. If this court were to apply de novo review to the factual findings, I can find no other case where the Ninth Circuit has done that in a free exercise analysis. This would be the first time that a panel would do that. Let me ask you about individualized exemptions because you've been talking about that. And so if the regulation sets up a system of individualized exemptions, as you're arguing, does that require us to apply strict scrutiny per se, or do we also have to evaluate or ask whether the board has, in fact, discriminatorily applied its discretion? In terms of the effect, the court's inquiry would be, are these regulations having an effect? But it's not the same analysis as the Equal Protection Clause, for example. You don't have to prove purpose or motive of the board in that process. All under the case law says fraternal order of police sets out the rules, I think, in a very clear way, where it talks about if there is sufficient, if that door is open to government discretion, where they can make value judgments. But any discretion? How about if it's discretion tied to objective criteria? It would not be. The case law says if you're looking at the relevant motive or the conduct for the action, that is an individualized exception. So one could argue, I suppose, that good faith is some type of objective criteria, but still it would fail because there's enough discretion to look at what was the relevant motive for that conduct, similar to Lukumi. Lukumi talks about what is an unnecessary killing. Sherbert is the good cause analysis. So there's three different provisions. But here, and this is your exact, I mean, Sherbert was good cause, Lukumi was unnecessarily, but here it's a good faith exception that's tied to the stocking, whether there's an assortment and all these other factors and items that we're supposed to, I guess, look at to see whether or not it's truly discretionary like these other two cases. The best testimony in the record for the State on the individualized analysis or the exemptions is them saying that the stocking rule is a case-by-case individualized analysis. There are multiple witnesses that confirm either the board has never enforced the stocking rule because they've never taken the time to until now, or that it's a case-by-case analysis. The court has just brought up representative assortment, patience, good faith compliance. Those are all vague words that allow the State massive discretion in deciding which referrals violate the rule and which do not. Let's say, just assume, or that rational basis review applies. Does this regulation pass rational basis review? No, it doesn't pass rational basis because of the stipulation. In the Levinson case, it talks about it can't be something that's arbitrary or attenuated. The stipulation was negotiated. It says in the stipulation the State conceded the facilitated referral occurs for many, many reasons. And that's even after- I can't say that it was as good. The stipulation is an interesting one because it says, well, these referrals don't create a danger to patients, but there's no stipulation that there isn't a better way. And so if under rational basis test all the State would have to demonstrate in some way or that would be logical to infer that while referral may be okay, it's not as good as the system they've set up. And under rational basis, wouldn't that be enough? Under rational basis- In theory. I know you don't think that it's good in this instance. But under rational basis, it doesn't have to be the best. It can just be the State's judgment that another way is better. Yes, Your Honor, it could be that. But the problem with this regulation is that they haven't taken that better way in any other context except with respect to religious referrals. Well, how does the rational or the facilitated referral provision still accomplish the State's compelling interest in timely access to medication? And, you know, considering the effect in rural areas where multiple pharmacies might not be available. The State doesn't have a compelling interest because all of the witnesses at trial- Just answer my question. How would it affect the rural areas when there's no multiple pharmacies? On the survey, for example, they oversampled rural pharmacies and said that there were a certain number of rural pharmacies that they had qualified as not being within a certain miles. Every single one of them stocked Plan B. So they haven't been able to demonstrate that there even is a problem in the rural areas of Washington. But you're asking for a very theoretical ruling. So in theory, what is to say, let's suppose one of those rural pharmacies was purchased by one of your clients who said, I'm no longer going to carry these things. So how would referral help? Facilitated referral in that instance could help get the patient the medication. There may also be government clinics in that area. But I think for purposes of whether a law is neutral or generally applicable, what the facts tell us, what the record tells us, is that it's ten times more likely a pharmacy wouldn't stock the drug because it just doesn't want to for convenience or profit reasons than for religious reasons. And I think, again, when the court goes back to looking at is there a problem, for example, under the gerrymander analysis, what we can see is that there are three factors to that. One is where is the practical burden of these regulations? And it's clear from the record the practical burden is not on those who are referring for business or convenience reasons. And Lukumi tells us that what we need to show under that analysis is that the burden falls on almost no other pharmacies, not exclusively on religion, not exclusively on moral objections and religious objections, but almost no others. So it's very clear that the Board of Ministers repeatedly testified there were no personal or moral objections asserted in the record and that there's no problem with access to any drug anywhere in the state. There's not a shred of evidence in the record suggesting, excuse me, the opposite. In addition, the interpreter... I was just curious about whether you had a view on the question whether it makes any difference that since the time of the first decision in this case, at least one of the applicable drugs has become over-the-counter. What difference does that make, if any? I think it makes it clear that the drugs are far more accessible than they were when we started the case, and even then they were accessible. But in terms of the mootness inquiry, the Council of Insurance Agents case tells us that you look at whether there still needs to be redress for the injury. It doesn't help the pharmacists and it doesn't help the pharmacy that it is now over-the-counter in the Plan B one-step. The reason for that is that the pharmacists are still required to be available to counsel in those situations and that many patients come in and request a particular brand of Plan B so they can get it covered under their insurance or for other financial reasons. I think my last Internet search showed that there were half a dozen different ones that were over-the-counter. There are some that are over-the-counter, but as I said, for example, the insurance will not often cover the over-the-counter products. And for the situation of our clients, Ms. Messler and Ms. Thielen, they still have to be available to consult on those over-the-counter products as well. In addition, it does nothing to alleviate the burden on Ralph's Pharmacy to stock those drugs, and there's no dispute on the record that Ella, which does operate differently and has a longer time period of effectiveness, is a prescription-only drug. There may be reasons that women need the Ella drug as opposed to Plan B. Thank you, Counsel. Your time has expired and we appreciate very much your interesting arguments and we will hear rebuttal for about three minutes and some odd seconds. The state has defined how to interpret the stocking rule and it has defined very clearly what the stocking rule means. The stocking rule is a requirement that a pharmacy provide the drugs that are necessary to serve its patients, not every drug that's out there because there are far too many for any one pharmacy to stock, but those that are necessary to meet its patients. Every exception that's been adopted in these rules is designed to further that goal of making drugs available to patients when they need them. In terms of the independent review of the facts that we're talking about, that comes from the Supreme Court. It comes from the Hurley case and others, that in First Amendment cases like this, that this court conducts an independent review of the facts. And again, I'd call your attention to the very Third Circuit case, that plaintiff's site, that the court there also said that in a free exercise case applying the same case, applying Hurley, that this court, the appellate court, conducts an independent review of the facts. It's not enough that the plaintiffs argue that they have been harmed by these rules. That's not the test. The test is, especially with respect to individualized exemptions, the test is whether the government applies the exemption discriminatorily. In other words, the harm is not measured by what the plaintiffs feel it to be. It's measured by what the government has intended in adopting these rules. And the evidence is very clear, going right back to the very beginning, if you look at the official pronouncements from the board, what its purpose was in adopting these rules. When you look at the statements that it made, when it announced that it was considering rulemaking, when it was publishing the draft rules, when it adopted the rules, when it explained to the regulated community what the rules did, in every one of those instances it said the goal of these rules, the intent of these rules, is to ensure access to medicine. It's to remove barriers to access. You go to the Lukumi case, you don't have an ordinance supported by statements saying, we want to get the people that believe in this outrageous fringe religion. It's easy to state rules with neutral principles. The case being made by plaintiffs and the findings of the district court suggests that that's all well and good, but in application, the only application turns out to be those who voice religious objections. If that were true, then are we dissuaded because the board used neutral language in adopting? No, certainly not, but those are the official interpretations. And what the plaintiffs have convinced the trial court to rely upon is speculation about what the board intended. By persons who were not on the board answering long hypothetical questions about what the board might do in a particular circumstance. Well, at least some of the statements were by the board's executive director. The executive director is not on the board. The executive director is a staff person who serves the board. And if you look at the executive director's statement, the executive director did not say each of these exemptions are exemptions that the board has recognized. At the most, what the executive director said was, these are the concerns that have been raised during the rulemaking process that we need to be thinking about. Thank you, counsel. The case just argued is now submitted, and I want to express appreciation to both counsel for excellent arguments that were helpful in this very challenging case. With that, we will stand adjourned.
judges: Graber, Clifton, Murguia